UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 06-499-GWU

| | |
|---|---|
| LESTER WHITEHEAD, | PLAINTIFF, |
| VS. | **MEMORANDUM OPINION** |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL SECURITY, | DEFENDANT. |

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991); Crouch v. Secretary of Health and Human Services, 909 F.2d 852, 855 (6th Cir. 1990). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Crouch, 909 F.2d at 855.

1

The regulations outline a five-step analysis for evaluating disability claims. See 20 C.F.R. Section 404.1520.

The step referring to the existence of a "severe" impairment has been held to be a de minimis hurdle in the disability determination process. Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986). An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985). Essentially, the severity requirements may be used to weed out claims that are "totally groundless." Id., n.1.

Step four refers to the ability to return to one's past relevant category of work, the plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which

appear at 20 CFR Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 CFR 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 CFR 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 CFR Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely

using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Lester Whitehead, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of a mood disorder, "rule out" anxiety disorder, "rule out" reading disorder, "rule out" malingering, and a history of resolving heel spurs and degenerative joint disease. (Tr. 17). Nevertheless, based in part on the testimony of a vocational expert (VE), the ALJ determined that Mr. Whitehead retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits. (Tr. 19-22). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether a person of the plaintiff's age, "limited" education, and work experience as a furniture van driver could perform any jobs if he were limited to "medium" level exertion, and also had

the following non-exertional impairments. (Tr. 396). He: (1) could occasionally climb, stoop, bend, crouch, and crawl and (2) would be restricted to only simple instructions and routine settings. (Tr. 396-7). The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies. (Id.).

On appeal, this court must determine whether the administrative decision is supported by substantial evidence. There is an additional issue regarding the time period applicable to the present case. The plaintiff previously filed applications for benefits, the most recent of which was denied in an ALJ decision of October 4, 2002 (Tr. 133-45), and affirmed by this court on October 6, 2004 (Tr. 53-64).[1] Mr. Whitehead's current SSI application carried a protective filing date of July 30, 2003 (Tr. 79-83), meaning that he is not eligible for benefits before that date.

Mr. Whitehead alleged disability due to a wide variety of problems, including lack of education, illiteracy, nerve problems, sleep disturbance, anxiety, depression, low back and neck pain, headaches, and leg pain. (Tr. 87).

---

[1] Although the plaintiff implicitly requested a reopening of the prior decision by alleging an onset date of April 7, 1995 (Tr. 80), the ALJ found that no good cause had been established for reopening and the unadjudicated period before him began October 5, 2002, the date immediately following the date of the prior decision (Tr. 14). The ALJ noted that he was bound by the determination of the plaintiff's residual functional capacity in the prior proceeding, absent new and material evidence or a showing of changed circumstances. Drummond v. Commissioner of Social Security, 126 F. 3rd 837 (6th Cir. 1997).

As the court noted in its prior Memorandum Opinion, office notes from the plaintiff's treating psychiatrist at the Comprehensive Care Center (CCC), Dr. E. Eskander, had recommended vocational rehabilitation, and suspected that he was not compliant with medications. (E.g., Tr. 58-9). An office note from this source dated September 25, 2002, not submitted in connection with the previous application, shows that the plaintiff remained at "the baseline of functioning," was denying any specific stressors, and, although he had lost his father recently, displayed little emotion. (Tr. 183). Dr. Eskander continued to question compliance with medications, noting that the patient did not know the doses he was supposed to take or how often he was supposed to take them, and said that rehabilitation was not contraindicated from a psychiatric perspective. (Id.). A psychosocial update in September, 2002, included comments that the plaintiff's main complaint seemed to be physical, and that he carried diagnoses of a depressive disorder, "rule out" malingering, and a personality disorder. (Tr. 156,162). His Global Assessment of Functioning (GAF) score was given as 65. (Tr. 156). A GAF score in this range reflects only "mild" symptoms, per the Diagnostic and Statistical Manual of Mental Disorders (4th Edition--Text Revision), p. 34. A counselor at CCC noted in November, 2002 that the plaintiff was not interested in referral to vocational rehabilitation and "seems to insist on disability issues." (Tr. 182). A new psychiatrist, Dr. S. Raza, began treating the plaintiff in January, 2003, and noted in

February that Mr. Whitehead was not interested vocational rehabilitation because it would be a "long way to travel." (Tr. 177). Dr. Raza wrote a letter on May 5, 2003, stating that Mr. Whitehead had a mood disorder, which was "partially responding" and that he was "suitable for disability benefits." (Tr. 155). Mr. Whitehead was feeling "overwhelmed" in September, 2003, after "being rejected by the Social Security," and Dr. Raza added an additional medication. (Tr. 169). Later notes from Dr. Raza from 2004 do not have a diagnosis of malingering, but continued the GAF of 65. (Tr. 323, 326). Mr. Whitehead's response to medication was "favorable." (Tr. 365).

The plaintiff underwent two consultative mental status evaluations by Mr. Phil Pack, a licensed psychological practitioner.

At the first examination in October, 2003, the plaintiff indicated that he was in special reading classes in school, and retained in the third and fourth grades. (Tr. 143). Despite his lack of education, Mr. Whitehead reported that he had a driver's license and had no difficulty using the phone or the Postal Service. (Tr. 144). Mr. Pack noted that the plaintiff's effort on testing was questionable and he generally made poor effort. (Id.). He alleged not knowing some of the most basic information, such as 2 plus 2. (Tr. 145). The Rey 15-Item Test also showed malingering. (Tr. 146). Mr. Whitehead obtained a full-scale IQ of only 52, and a reading ability at kindergarten level. (Tr. 145). Mr. Pack's only diagnosis was

7

"malingering," however, and he stated that he was unable to determine functional restrictions without valid testing. (Tr. 146-7).

Mr. Pack conducted another evaluation of the plaintiff in April, 2004, and also reviewed some school records including transcripts and results of achievement testing. (Tr. 253-4). The showed that the plaintiff had obtained an IQ score of 88 in the sixth grade, 67 in the eighth grade, and 75 in the ninth grade. (Tr. 123). Mr. Pack again questioned the plaintiff's effort on testing and commented that his inability to complete some of the most elementary tasks seemed inconsistent with his work history and even inconsistent with the school test data. (Tr. 255). His full-scale IQ was only 54, and reading was at the first grade level, but the Rey 15-Item Test again showed malingering. (Tr. 256-7). Mr. Pack diagnosed "rule out" anxiety disorder "by patient history," and concluded that he should have a "good" ability to sustain attention and relate to others, but he was unable to determine his ability in other areas of functioning. (Tr. 257-8).

A state agency psychologist, Dr. Edward Stodola, reviewed the evidence and concluded that the plaintiff would have only a moderately limited ability to understand, remember, and carry out detailed instructions. (Tr. 301-2). This was consistent with the hypothetical question.

While the plaintiff suggests that a comment by Dr. Raza that he was "suitable for disability benefits" should be entitled to controlling weight, the ALJ reasonably

concluded that a conclusory finding of disability was inconsistent with the actual treatment notes from CCC, as well as reports from the consultative psychologist. (Tr. 19).  In addition, the meaning of the statement "suitable for disability benefits" is unclear, and might have been a reference to the plaintiff's ability to manage disability benefits if they were awarded.  In any case, whether or not an individual is "disabled" is a vocational conclusion outside a physician's area of expertise. Accordingly, the ALJ's determination of the plaintiff's mental functioning is supported by substantial evidence.

Regarding Mr. Whitehead's physical condition, his treating family physician, Dr. Roy Varghese, recorded subjective complaints of severe back and neck pain, sciatica, anxiety, depression, and degenerative joint disease in a June, 2003 office visit, but his actual physical examination showed negative straight leg raising and no neurological deficits, although his back was said to be tender and muscle spasms were present.  (Tr. 137).  The plaintiff also later complained of pain and swelling in his right knee, foot pain, and acid reflux.  (Tr. 134-5).  However, x-rays of the feet, right shoulder, lumbosacral spine, and cervical spine were essentially normal.  (Tr. 152-3, 342, 348).  He was referred to a foot specialist, Dr. Richard Skrip, who provided injections and noted at the last visit that Mr. Whitehead had a "resolving" heel spur and "resolving" plantar faciitis. (Tr. 360).  An MRI of the cervical spine in October, 2004, after complaints of pain following removal of a cyst

from the neck, was "motion compromised," but read to be normal. (Tr. 316). Despite minimal findings on physical examination and largely negative objective studies, Dr. Varghese opined that the plaintiff was "totally disabled" in March, 2003 (Tr. 248), again a vocational conclusion entitled to little weight. He reiterated the opinion that Mr. Whitehead was "disabled" in February, 2005. (Tr. 317). Dr. Varghese did prepare a specific residual functional capacity form in May, 2004, stating that the plaintiff was limited to sedentary level exertion with less than full-time sitting and standing, in addition to having other restrictions, due to back and neck pain. (Tr. 260-1). However, although the opinion of a treating physician is entitled to great weight, it is not entitled to controlling weight where it is unsupported by objective evidence. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985). In addition to the problem with lack of evidence in Dr. Varghese's notes, the plaintiff also underwent a consultative physical examination by Dr. A. Dahhan in October, 2003, which showed essentially no abnormalities other than a reduced range of motion. (Tr. 138-41). State agency physicians who reviewed the record through April, 2004, concluded that Mr. Whitehead would have physical restrictions consistent with the hypothetical question. (Tr. 264-9, 307-14). While Dr. Varghese's specific restrictions were provided after the state agency sources had reviewed the evidence, the court concludes that, under the circumstances of this particular case, there was substantial evidence to accept their opinion over that of

06-499-GWU  Whitehead

the treating physician, given the lack of objective test findings, and the lack of specific physical findings by Dr. Varghese, as well as some of the internal inconsistencies in his office notes, such as stating that the plaintiff had "severe" back pain, but then finding no abnormalities on examination.  (E.g. Tr. 244). Moreover, the ALJ fulfilled the procedural requirement of 20 C.F.R Section 416.927 by giving good reasons for rejecting the opinion of the treating source. <u>Wilson v. Commissioner of Social Security</u>, 378 F.3d 541, 544-5 (6th Cir. 2004).

The decision will be affirmed.

This the 22nd day of August, 2007.

Signed By:
<u>G. Wix Unthank</u>
United States Senior Judge